| | |
|---|---|
| ESG TECHNICAL SERVICES, LLC,     ) | |
|                                          ) | |
|         Plaintiff,              ) | |
|                                          ) | |
|         v.                     ) | Case No. 1:09-cv-00030-TWP-TAB |
|                                          ) | |
| ADVANTAGE HEALTH SOLUTIONS, INC., ) | |
| and SCHALLER ANDERSON MEDICAL   ) | |
| ADMINISTRATORS, INCORPORATED,   ) | |
|                                          ) | |
|         Defendants.          ) | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' Motions for Summary Judgment. Defendant Advantage Health Solutions, Inc. ("Advantage") filed a Motion for Summary Judgment against Plaintiff ESG Technical Services, LLC ("ESG"). [Dkt. 84]. ESG filed a Cross Motion for Partial Summary Judgment against Advantage. [Dkt. 105]. Also before the Court is Defendant Schaller Anderson Medical Administrators Incorporated's ("Schaller Anderson") Motion for Summary Judgment against ESG. [Dkt. 87]. For the reasons stated herein, ESG's Motion for Partial Summary Judgment is **DENIED**. [Dkt. 105]. Both Advantage and Schaller Anderson's Motions for Summary Judgment are **GRANTED in part** and **DENIED in part**. [Dkt. 84, Dkt. 105].

## I. FACTUAL BACKGROUND

This case involves ESG's role in a contract between Advantage and the State of Indiana ("State"). ESG alleges that Advantage and Schaller Anderson's decision not to utilize ESG's real estate services, despite Advantage listing ESG as a potential subcontractor in its bid, was racially motivated.

1

## A. The Parties Involved

ESG is a certified Minority-Owned Business Enterprise ("MBE") owned and operated by Steve Nelson, who is African-American.  ESG provides commercial real estate services.  At the time of the events giving rise to this dispute, ESG had one client for which it provided real estate services, whereby it leased space for approximately $18,000.00 per month and subleased that space to the client for approximately $30,000.00 per month.  As part of this arrangement, ESG was responsible for costs associated with insurance, maintenance, document shredding, and other buildings costs.  The exact nature of the real estate services that ESG was to provide Advantage and Schaller Anderson is disputed, but according to ESG it would entail a similar arrangement.

Advantage is a health maintenance organization licensed by the Indiana Department of Insurance to offer group health benefits to employers throughout Indiana.  Advantage administers a Medicaid program for the State called Indiana Care Select ("Care Select").  Care Select provides managed care to the aged, blind, disabled, and other disability categories as determined by the State.  In its bid for the Care Select program, Advantage included ESG as a MBE subcontractor.

Schaller Anderson specializes in providing medicaid services, including day-to-day management, prior care authorization, and on-site call centers for member interaction.  Schaller Anderson serves as Advantage's subcontractor in the Care Select program, operating a call center.  In July 2007, Aetna Insurance acquired Schaller Anderson and took control over Schaller Anderson's leases and subleases.

## B. The Bidding Process

In December 2006, the State issued a request for service to privatize the management of the Care Select program.  In early March 2007, Advantage and Schaller Anderson agreed to

work together on a bid for the Care Select program, with Schaller Anderson taking the lead in identifying MBEs and Women Business Enterprises ("WBE") as potential subcontractors. The State awarded points to bidders based on MBE and WBE participation.

In early 2007, Schaller Anderson employee Christina Brown contacted ESG about providing real estate services for the Care Select program. Schaller Anderson informed ESG that it would need approximately 25,000 square feet of office space. According to Schaller Anderson, it intended to utilize ESG's services to locate and lease space for Schaller Anderson employees. Initially, Schaller Anderson believed that ESG owned commercial real estate.

After discussions between the parties, Advantage and ESG signed a letter of commitment. The letter of commitment stated that ESG was to provide real estate services and would receive $500,000.00 annually for a period of four years totaling $2,000,000.00. On March 7, 2007, Advantage submitted its bid for the Care Select program and the bid included ESG's letter of commitment. In May 2007, the State requested that Advantage submit a new letter of commitment from ESG with more information. The new letter of commitment added that the real estate services were for lease of office space for the Care Select program and estimated that 25,000 square feet of office space would be needed.

## C. The Contract

On June 13, 2007, the State sent award recommendation letters recommending splitting the contract between the top two companies in terms of points; Advantage was the second place finisher. According to both Advantage and Schaller Anderson, being awarded only part of the contract changed the economics of the project and adjustments had to be made to the original plan, including the amount spent on MBEs and WBEs. For Schaller Anderson, the split bid

award reduced the number of full time employees it would need and correspondingly reduced the amount of office space it would need.

The contract required Advantage to comply with Indiana Administrative Code provisions that relate to MBEs and WBEs. The contract also contained a provision that required Advantage to submit any changes to the listed MBEs and WBEs in writing and get written approval from the Indiana Department of Administration ("IDOA"), which monitors compliance with the MBE/WBE program. ESG was included in the list of MBEs participating in the project.

## D. Potential Care Select Locations

The parties looked at a number of properties in search of office space. ESG assisted in the search for some of the properties. As early as March, 2007, ESG emailed information to Schaller Anderson regarding a potential location for Schaller Anderson's call center.

At some point around the time Advantage learned of its successful bid, Advantage and Schaller Anderson decided to co-locate. At the time, Advantage occupied a building on Priority Way but had begun looking for new office space in January, 2007, because its lease expired in early 2008. After the decision to co-locate, Advantage began looking for locations that could house both Advantage and Schaller Anderson.

In July, 2007, Advantage's Chief Financial Officer Jennifer Ponski ("Ms. Ponski"), Mary Ferguson ("Ms. Ferguson") from Schaller Anderson, and Steve Nelson ("Mr. Nelson") from ESG toured a building known as the MJ Building, which Advantage's then-landlord owned. Advantage began negotiations for the building in August, 2007, but this deal fell through.

Advantage then began working with Duke Realty ("Duke") to find space. Duke proposed building a new location on River Road. Advantage hired Summit Realty Group ("Summit") to

begin negotiations with Duke for lease space. In this plan, Advantage would lease the space and then sublease a portion to ESG, who, in turn, would sublease that portion to Schaller Anderson.

Since the River Road location would not be ready until 2008, Schaller Anderson needed to find temporary space near Advantage's Priority Way location. Advantage found space nearby that was leased by a company known as Nyhart. Schaller Anderson subleased the space from Nyhart directly. It is unclear whether ESG could have leased space from Nyhart and then sublet to Schaller Anderson. Advantage and Schaller Anderson believed this was not possible because the primary lease had an occupancy requirement and ESG would not be occupying the space.

## E. No Deal Reached with ESG

According to Advantage, Ms. Ponski contacted Mr. Nelson in August, 2007 inquiring whether Mr. Nelson would be interested in having ESG lease space from Advantage at the River Road location and then subleasing it to Schaller Anderson. Mr. Nelson, however, wanted to move forward with what he believed was the original structure, which involved ESG signing the main lease and then subleasing the space to Schaller Anderson and Advantage. According to Advantage, it never intended to lease its space from ESG. Around this time, Ms. Ponski began to question whether ESG provided any economic benefit to the project.

On September 10, 2007, Schaller Anderson emailed ESG indicating that the State requested updated letters of commitment. It is not clear whether the State actually requested the updated letters. The updated letter reduced ESG's annual amount from the $500,000.00 to $112,750.00. Mr. Nelson did not sign the updated letter because, according to him, when he asked for clarification regarding the proposed basis for the change, Ms. Ferguson told him to contact Ms. Ponski. Mr. Nelson attempted to contact Ms. Ponski but was unsuccessful.

With regard to the Nyhart lease, Ms. Ferguson proposed a solution to the occupancy requirement that prevented ESG from leasing the space from Nyhart. Ms. Ferguson discussed with ESG the possibility of ESG serving as a project or property manager for Schaller Anderson. ESG, however, never submitted a proposal to Schaller Anderson.

Ultimately, ESG did not contract with Advantage to perform real estate services. Despite not being able to negotiate a contract, ESG remained listed as a participating MBE in the State contract until April, 2008 when the State conducted an audit of Advantage's MBE/WBE compliance.

## II. <u>LEGAL STANDARDS</u>

### A. Cross Motions

It is not uncommon for a court to be confronted with cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard." *Kohl v. Ass'n of Trial Lawyers of Am.*, 183 F.R.D. 475, 478 (D. Md. 1998).

### B. Summary Judgment

Summary judgment is appropriate when "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. Temain*, 2010 WL 5391578, at *1 (N.D. Ind. 2010) (quoting Fed. R. Civ. P. 56(a)). In arguing whether a fact can or cannot be genuinely disputed, a party must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials…." *Id.* at *2 (quoting 56(c)(1)).

A fact is material if it might affect the outcome of the suit. *Fanslow v. Chicago Mfg. Center, Inc.,* 384 F.3d 469, 478 (7th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). The substantive law controlling the case or issue identifies the facts that are material. *Id.* Thus, only disputes over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Id.*

The Court must draw all reasonable inferences from undisputed facts in favor of the non-moving party and view the disputed evidence in the light most favorable to the non-moving party. *First Bank & Trust v. Firstar Info. Services, Corp.*, 276 F.3d 317, 322 (7th Cir. 2001). The non-moving party, however, may not rest upon mere allegations in the pleadings or upon conclusory testimony or affidavits; rather, it must go beyond the pleadings to support his contentions with properly admissible evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### III. <u>DISCUSSION</u>

In its Complaint, ESG asserts claims for: (1) discrimination in violation of 42 U.S.C. § 1981 and § 1983; (2) breach of contract as a third-party beneficiary; and (3) tortious inference with a contract/business relationship claim against Schaller Anderson. ESG argues that it is entitled to summary judgment on: (1) the issue of whether ESG was an intended third-party beneficiary to the contract; and (2) the determination that Advantage was a state actor for purposes of Section 1983. Advantage argues that the undisputed facts demonstrate that ESG was not an intended third-party beneficiary and that Advantage did not discriminate against ESG. Thus, Advantage argues it is entitled to summary judgment on the claims against it. Likewise, Schaller Anderson argues that it is entitled to summary judgment in its favor for the discrimination claim and the tortious interference claims.

## A. Whether ESG was a Third-Party Beneficiary to the Contract

ESG contends that it was a third-party beneficiary to the contract between Advantage and the State. [Dkt. 115 at 3]. A third-party beneficiary is a "person who, though not a party to a contract, stands to benefit from the contract's performance." *DLZ Ind., LLC v. Greene Cnty.,* 902 N.E.2d 323, 330 n.4 (Ind. Ct. App. 2009) (quoting Black's Law Dictionary 149 (7th ed. 1999)). To establish itself as a third-party beneficiary, ESG has the burden of showing:

> (1) A clear intent by the actual parties to the contract to benefit the third party;
> (2) A duty imposed on one of the contracting parties in favor of the third party; and
> (3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001) (citing *NN Investors Life Ins. Co. Inc. v. Crossley*, 580 N.E.2d 307, 309 (Ind. Ct. App. 1991)).

The contracting parties' intent to benefit the third-party is the controlling factor in the analysis. *Luhnow*, 760 N.E.2d at 309. "The intent necessary…is not a desire or purpose to confer a particular benefit upon the third-party nor a desire to advance his interest or promote his welfare, but an intent that the promising party or parties shall assume a direct obligation to him." *Nat'l. Bd. of Exam'rs for Osteopathic Physicians & Surgeons, Inc. v. Am. Osteopathic Ass'n*, 645 N.E.2d 608, 618 (Ind. Ct. App. 1994) (citing *Jackman Cigar Mfg. v. John Berger & Son Co.*, 52 N.E.2d 363, 367 (Ind. Ct. App. 1944)). The contracting parties' intent to "bestow rights upon a third-party must affirmatively appear from the language of the instrument." *City of Indianapolis v. Kahlo*, 938 N.E.2d 734, 742 (Ind. Ct. App. 2010) (quoting *Cain v. Griffin*, 849 N.E.2d 507, 514 (Ind. 2006)). Intent may be shown by specifically naming the third-party or by other evidence. *Luhnow*, 760 N.E.2d at 309. A court should consider the provisions of the contract that demonstrate an intent to benefit other persons. *Id.*

Interpretation of a contract generally presents a question of law to be decided by the court. *Town of Plainfield v. Paden Eng'g. Co., Inc.,* 943 N.E.2d 904, 909 (Ind. Ct. App. 2011). A court should interpret a contract in such a way "so as not to render any words, phrases, or terms ineffective or meaningless" and should accept an interpretation that harmonizes the provisions, not one that places provisions in conflict. *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, *Inc.*, 867 N.E.2d 203, 213 (Ind. Ct. App. 2007).

### i. Whether the Parties Intended to Benefit ESG as a Third-Party Beneficiary

As a starting point, the Court notes that there is no doubt the State has a noble goal of encouraging equal opportunity for MBEs and WBEs to participate in the State's award of contracts. *See* 25 Ind. Admin. Code 5-1-3 (West 2009). While the State might intend to benefit or advance the interests of MBEs and WBEs as a whole, the MBE/WBE program does not automatically establish ESG as a third-party beneficiary. *See Indianapolis Minority Contractors v. Wiley*, 187 F.3d 743 (7th Cir. 1999) (finding that a 10% minority participation goal for disadvantage business enterprises did not "guarantee that any one disadvantaged group will receive any contracts, let alone that any individual in any group will receive a contract or any other individual benefit"). Therefore, for ESG to show that the parties intended to benefit it as a third-party beneficiary, ESG must present evidence that the parties specifically intended to benefit ESG and not simply an intent to benefit MBEs and WBEs generally.

ESG contends that the fact that it was specifically named in the contract shows that Advantage and the State "clearly intended to benefit ESG." [Dkt. 115 at 12]. The fact that ESG is mentioned in the contract, however, does not establish an intent to benefit ESG as a third-party beneficiary; rather, naming a party is merely evidence of such an intent. *Corrugated Paper Products, Inc. v. Longview Fibre Co*., 868 F.2d 908, 911 (Ind. Ct. App. 1989); *see also E.B.*

*Harper & Co. v. Nortek, Inc.*, 104 F.3d 913 920 n.4 (7th Cir. 1997) (finding that under Illinois law Plaintiff was not an intended third-party beneficiary despite being named in the contract). To determine the intention of the parties, this Court must view the contract as a whole and "not from detached provisions thereof." *McClain's Estate v. McClain*, 183 N.E.2d 842 (Ind. Ct. App. 1962).

The contract consists of twenty-two pages with fifty-three provisions; ESG is named in the only provision that addresses MBE and WBE participation. [Dkt. 1 Ex. 3 at 12]. This provision lists all participating MBEs and WBEs, including ESG, and states that ESG was to provide real estate management services (building lease) at an annual rate of $500,000.00. [Dkt. 1 Ex. 3 at 12]. Under this provision, Advantage is required to comply with the State rules governing MBEs and WBEs and the provision required that "[d]uring the course of this Contract, any change to the listed firms found in this Section must be submitted to, and approved by, IDOA in writing. A formal amendment process is not required, but formal written approval from IDOA is required for changes in subcontractor participation." [Dkt. 1 Ex. 3 at 12].

This provision primarily benefits the State in ensuring that Advantage remains in compliance with the MBE/WBE program. ESG benefits from this provision only in the sense that Advantage had to receive State approval to remove ESG from the participation list. The provision does not prevent ESG from being removed as a participating MBE, it does not allow ESG to challenge its removal, nor does it prevent Advantage from replacing ESG with other MBEs or WBEs. The provision also does not require Advantage to contract with ESG or to pay ESG any of the $500,000.00 annual amounts. This provision, standing alone, does not establish the intent to specifically benefit ESG as a third-party beneficiary.

In reviewing the remainder of the contract, nowhere does it discuss ESG or any rights ESG has under the contract. The only provision that discusses any third-party rights is a provision regarding assignments. [Dkt. 1 Ex. 3 at 4]. This provision allows Advantage to assign its right to payments to a third-party. [*Id.*]. Advantage did not assign any of its rights to payment to ESG.

The remaining provisions detail the rights and obligations of the parties. For example, the contract includes provisions allowing either the State or Advantage the right to terminate the contract. The State may terminate the contract, in whole or in part, for any reason that the State determines is in its best interest. [Dkt. 1 Ex. 3 at 17]. Upon such termination, the State must compensate Advantage for the services already provided. Likewise, Advantage may terminate the contract if the State defaults. [Dkt. 1 Ex. 3 at 8]. This provision also gives Advantage the right to collect monies due if the State fails to cure or correct material breaches within sixty days. These provisions do not mention any third-party rights in regards to either terminating the contract or collecting payments.

Another provision of the contract lists Advantage's duties. [Dkt. 1 Ex. 3 at 1-3]. One of its duties is to follow the requirements set forth in the contract for all subcontracts. These requirements, in part, include (1) executing a legally binding agreement in writing, (2) that specifies the functions of the subcontractor, (3) includes the amount, duration, and scope of services to be provided in the subcontract, and (4) includes provisions for revoking the subcontract or imposing sanctions for poor performance. [Dkt. 1 Ex. 3 at 2-3]. Advantage has ninety days after the contract's effective date to comply with these requirements. [*Id.*].

These subcontract requirements indicate the parties did not intend to bestow third-party benefits on any of the subcontractors at the time of the contract's execution. In fact, the

subcontract requirements indicate that the parties anticipated that legally binding agreements might still need to be reached, which likely would entail further negotiations. There is no guarantee that, after further negotiations, the parties would reach an agreement. By requiring a legally binding agreement between Advantage and its subcontractors, the contract indicates further steps were necessary before a subcontractor gained any rights against Advantage. Any contractual rights of the subcontractors would derive from being a party to the subcontract and not from being a third-party beneficiary to the State contract.

The contract did not exclude potential MBEs and WBEs from the subcontract requirements. Thus, after the contract's execution, ESG and Advantage had to reach a legally binding agreement before ESG had any enforceable rights. There is no dispute that ESG and Advantage never reached a legally binding agreement.

The State's representative, Jessica Robertson ("Ms. Robertson"), testified that it is not uncommon that a prime contractor and a particular MBE or WBE are unable "to truly come to terms." [Dkt. 89 Ex. 23 Robertson Dep., at 100:14-21]. According to Ms. Robertson, if an agreement with a particular MBE or WBE is not reached, the State will work with the prime contractor to ensure participation levels are met because the State recognizes that events happen that change the projects needs, sometimes the MBE or WBE is at fault, or the prime contractor has business reasons for not going through with a deal. [*Id.* at 34:6-15].

Under ESG's reading of the MBE/WBE provision, however, ESG became a third-party beneficiary by virtue of being listed as a participating MBE, thereby requiring Advantage to contract with ESG for the exact services listed in the contract with the State. Such a reading is inconsistent with both the language of the MBE/WBE provision and the subcontract requirements. The MBE/WBE provision did not require Advantage to contract with ESG as

evidenced by the procedure for removing a MBE or WBE. The provision containing the subcontract requirements also did not require Advantage to subcontract with ESG. Under the subcontract requirements, Advantage and ESG had ninety days after the execution of the contract to execute a subcontract, but Advantage and ESG were unable to reach an agreement. ESG's reading of the MBE/WBE provision attempts to bypass this requirement.

The only evidence that ESG has presented to show that it was an intended third-party beneficiary is the fact that it is listed in the contract as a participating MBE. In reviewing the contract as a whole, the Court finds that the parties did not intend to bestow third-party beneficiary rights on ESG by listing ESG as a participating MBE. Absent listing ESG as a participating MBE, there is no evidence, whatsoever, that the parties intended for ESG to be a third-party beneficiary.

### ii.  Whether the Contract Imposed a Duty on Advantage in Favor of ESG

In regards to the second element necessary to show it was a third-party beneficiary, ESG contends that the contract imposes a duty on Advantage in favor of ESG. [Dkt. 115 at 12]. First, ESG contends that "the State expects Contractors to make good faith efforts to follow through on entering contracts with M/WBEs listed in their participation plan, and to fulfill the commitments made during the procurement process." [*Id.*]. The four corners of this particular contract however, do not discuss a duty of good faith in entering contracts with the listed MBEs and WBEs.

Presumably then, ESG found this duty of good faith in Ms. Robertson's deposition testimony. Ms. Robertson described a good faith effort as either good faith in entering into contracts with the particular MBE or "to commit to a similar dollar amount or percent of the contract." [Dkt. 124 Ex. A Robertson Dep. 24:13-25:2]. If a duty of good faith does exist in the

contract, the Court finds that the duty was not in favor of ESG because Advantage could satisfy the good faith duty by including other MBEs or WBEs, so long as there was a similar dollar amount or percent of the contract committed. Advantage satisfied any good faith duty it owed by adding four additional WBE's. [Dkt. 86 Ex. 8].

The other duties cited by ESG are all duties owed to the State and favor ESG only tangentially. Even ESG states "Advantage has failed various contractual duties to the State." [Dkt. 115 at 12]. The first alleged failure that ESG points to is the duty to inform IDOA of any changes to the listed MBEs or WBEs. Advantage, however, did inform the State of the change, albeit, seven months after the execution of the contract. Unfortunately for ESG's position, the contract, does not dictate when Advantage must notify the State. ESG cannot show how it would have benefitted if Advantage had immediately informed the State of its decision not to use ESG. As previously mentioned, the State would have worked with Advantage to remain compliant with the MBE/WBE program. [Dkt. 89 Ex. 23 Robertson Dep., at 34:6-15].

ESG argues that Advantage "clearly owed a duty to the State to make true and accurate representations surrounding its relationship with ESG in the Contract." [Dkt. 115 at 12]. ESG contends that Advantage gave the State a false reason as to why ESG would not be included. In response to an audit by the State, Advantage's President and CEO Vicki Perry sent a letter informing the State that ESG would not be participating in the project. [Dkt. 86 Ex. 7]. The letter correctly stated that Aetna Insurance acquired Schaller Anderson and Aetna handles real estate for its subsidiaries, that Advantage and Schaller Anderson decided to co-locate, and that Advantage began negotiations with Duke to secure space in the River Road location. The letter incorrectly stated that the Duke Lease Agreement would not allow a third-party to hold the lease.

Advantage maintains that Perry was simply mistaken and confused the Duke lease with the Nyhart lease.

While Advantage owed the State a duty to make true representations, ESG fails to show how this favors ESG. Notifying the State of changes allowed the State to determine whether Advantage remained compliant with its MBE and WBE obligation. Advantage did not owe a duty specifically to ESG; rather, Advantage had a duty to remain compliant with its MBE and WBE obligation. The State audit deemed Advantage in compliance. [Dkt. 86 Ex. 24].

ESG next argues that Advantage did not receive formal written approval for the changes in MBE participation as required by the contract. Ms. Robertson, however, testified that the State did not have procedures in place at the time to provide formal written approvals. [Dkt. 86 Ex. 21 Robertson Dep. at 78:5-80:3]. Advantage cannot be faulted for not receiving formal written approval when the State had not yet developed the procedures. Even still, this is an obligation between Advantage and the State that does not impact Advantage's relationship with ESG. Therefore, ESG has not shown that the contract imposes a duty on Advantage in favor of ESG.

### iii. Whether Performance of the Contract Would Render a Direct Benefit to ESG

To establish the third element necessary to show it was a third-party beneficiary, ESG claims that it would directly benefit by having been "given the opportunity to engage in leasing services, and derive the benefits of compensation, experience, exposure, and the opportunity to grow its business." [Dkt. 126 at 4]. According to ESG, it would have had these direct benefits had "Advantage made good faith efforts to perform in accordance with the Contract…and refrained from a pattern of misrepresentations to ESG and the State." [Dkt. 126 at 4]. There is no doubt that ESG would have gained these benefits had it subcontracted with Advantage to

provide real estate management services. The problem, however, is that the parties never reached an agreement on the final terms of any subcontract.

ESG cites *Jones v. Local 520, International Union of Operating Engineers*, 603 F.2d 664 (7th Cir. 1979), for support. [Dkt. 115 at 13]. In *Jones*, union members sued the union to enforce rights arising from a preferential hiring agreement. *Id.* at 665. The issue before the court was whether the appellants had a cause of action under 42 U.S.C. §1981. The agreement established a fixed ratio for job openings, with one minority referral for every four non-minority referrals. *Id.* The court found that the agreement created third-party beneficiary rights in the white and black operating engineers who stood to benefit from the operation of the referral plan. *Id.* As the specific issue of third-party beneficiary status was not before the court, the court did not go into any detailed analysis regarding the third-party beneficiary issue or discuss the specific language in the agreement that created third-party beneficiary rights.

This Court finds *Jones* distinguishable. Here, the issue of whether ESG is a third-party beneficiary of the contract is directly before the Court. As previously stated, this involves determining the intent of the parties as demonstrated by the language of the contract. *Kahlo*, 938 N.E.2d at 742. Therefore, *Jones* does not resolve the particular issue before this Court.

Unlike *Jones*, where the union was not performing the terms of the agreement, Advantage has performed the contract terms. ESG mistakenly believes that the terms of the contract required Advantage to subcontract with ESG regardless of whether the parties could reach an agreement. The terms, however, did not require Advantage to contract with ESG.

The contract as a whole addresses the rights and obligations of Advantage and the State, however, an intent to benefit ESG as a third-party beneficiary does not affirmatively appear from the language of the contract. Therefore, the Court must conclude that, as a matter of law, ESG

was not an intended third-party beneficiary to the contract.  As ESG cannot show the necessary elements to establish its third-party beneficiary status, it is not entitled to summary judgment on this issue.  Since ESG cannot establish itself as a third-party beneficiary, it cannot maintain its third-party breach of contract claim.  The Court, therefore, grants Advantage's Motion for Summary Judgment on this claim.

## B. Whether Advantage and Schaller Anderson Discriminated Against ESG

ESG contends that Advantage and Schaller Anderson discriminated against ESG based on Mr. Nelson's race in violation of § 1981.  [Dkt. 115 at 14; Dkt. 118 at 11].  Additionally, ESG claims that Advantage, as a state actor, discriminated against it in violation of Section 1983.  [Dkt. 115 at 22].  Since under both Section 1981 and Section 1983, ESG must produce evidence of an intent to discriminate based on race, the Court will address whether ESG can establish a *prima facie* case under Section 1981.  *See Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845, 850 n.7 (7th Cir. 2010).

Under Section 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts…as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  Section 1981 defines "to make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  §1981(b).  Thus, to successfully bring a claim, the plaintiff must identify an impaired contractual relationship under which the plaintiff has rights.  *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 476 (2006).

ESG does not clearly identify an impaired contractual relationship under which it has rights.  To the extent that ESG is basing its claim on the existing contract between Advantage and the State, its discrimination claim fails because as discussed earlier, ESG was not a third-

party beneficiary to the contract and as such, there was no impairment to an existing contractual relationship. *See Domino's Pizza, Inc.,* 546 U.S. at 476. The Court, therefore, will focus its analysis on whether racial motivation blocked the creation of a contractual relationship between ESG and the Defendants.

Because ESG does not claim to have direct evidence of discrimination, to establish its Section 1981 claim it must provide indirect evidence of discrimination that would allow the trier of fact to infer discrimination. *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998). Courts in the Seventh Circuit have applied two standards for Section 1981 claims involving indirect proof of discrimination, the *McDonnell Douglas* standard and the *Morris* standard.[1]

In the employment context, the Seventh Circuit has applied the *McDonnell Douglas* standards, which would require ESG to establish that: (1) ESG belongs to a protected class; (2) ESG met Defendants expectations; (3) ESG suffered an adverse action; and (4) that similarly-situated non-protected class individuals were treated more favorably than ESG. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).[2] Some courts have applied the *McDonnell Douglas* standard to non-employment cases. *See Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 830 (7th Cir. 2007); *see also Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.,* No. 2:01 CV 419 PS, 2004 U.S. Dist. LEXIS 17945 * 26-27 (N.D. Ind. 2004) (noting that for non-employment cases, courts have struggled with the proper framework by which a plaintiff may show intentional discrimination).

Under the second standard, known as the *Morris* standard, ESG must prove that: (1) it is a member of a racial minority; (2) Advantage and Schaller Anderson intended to discriminate on

---

[1] The parties disagree as to which standard applies in this case.

[2] The method of proof for § 1981 claims involving employment is essentially identical to the method of proof for Title VII discrimination claims. *See Freeman v Chicago Park Dist.,* 189 F.3d 613, 618 (7th Cir. 1999).

the basis of race; and (3) the discrimination concerned the making or enforcing of a contract. *Pourghoraishi v. Flying J, Inc*., 449 F.3d 751, 756 (7th Cir. 2006) (citing *Morris v. Office Max, Inc*., 89 F.3d 411, 413 (7th Cir. 1996)).  The parties agree that regardless of which test applies, ESG "must produce at least some evidence…from which a jury could infer that [ESG] was discriminated against on the basis of an improper motive."  *Black Agents & Brokers Agency, Inc.,* 2004 U.S. Dist. LEXIS 17945, at *27.

If ESG establishes its *prima facie* case, a presumption of discrimination arises.  *Batteast Const. Co., Inc. v. Henry County Bd. of Com'rs*., 194 F. Supp. 2d 828, 834 (S.D. Ind. 2002).  To overcome the presumption, Advantage and Schaller Anderson must present evidence that they had a legitimate non-discriminatory reason for their decision.  *Id*.  If Advantage and Schaller Anderson present evidence of a legitimate non-discriminatory reason, then ESG must show that the proffered reason was a pretext for discrimination.  *Id*.

The Court will apply the *Morris* standard that ESG proposes since in either case ESG must proffer evidence of discrimination.  There is no dispute that ESG is owned by a racial minority.  The Court will, therefore, focus on the second and third prongs of the *Morris* standard.[3]

## i. Whether Advantage and Schaller Anderson Intended to Discriminate

Advantage contends that ESG proffers nothing but conclusory allegations that race was the motivating factor in not entering into a contract with ESG.  [Dkt. 85 at 20].  Advantage specifically points to deposition testimony of Mr. Nelson regarding why he believed the decision was motivated by race.  Mr. Nelson stated:

---

[3] Because both Advantage and Schaller Anderson make similar arguments and ESG's responses to both Motions for Summary Judgment are based on the same facts and ESG makes similar arguments as to how it establishes discrimination, the Court will discuss both motions together and differentiate between the parties when necessary.

> For the main reason, the lost opportunity, and the fact that we're a minority company. We could provide the lease. We were good enough to be brought to the dance. We was there [sic]. We stood in the dance with the prime parties; but yet, when the award was made, when the award was made, in other words, after the price has already been revealed, then ESG Tech cannot share, but we helped the prime parties get there.

[Dkt. 86 Ex. ESG Dep. 187:25-188:09]. Advantage argues ESG has presented no evidence of discriminatory intent to support its allegations and has based its discrimination claim on the fact that ESG is a minority owned business and Advantage did not contract with ESG. [Dkt. 85 at 21].

The fact that ESG was a minority owned company is not evidence of an intent to discriminate. In *Black Agents & Brokers Agency Inc*., the court rejected the argument that being owned by African-Americans was, in itself, evidence of an intent to discriminate. 2004 U.S. Dist. LEXIS, 17945, at *25. If being minority owned could be evidence of discrimination an odd result occurs; the first element of ESG's *prima face* case, that it is a racial minority, would assist in establishing the second element of ESG's *prima facie* case. ESG, however, does come forward with some evidence from which a jury could infer intentional discrimination.

ESG cites *Brant Constr. Co. v. Lumen Constr. Inc.*, 515 N.E.2d 868 (Ind. Ct. App. 1987), as analogous to ESG's claim. In *Brant*, the defendant was the lowest bidder for a waste water treatment plant expansion project for the City of Valparaiso. *Id.* at 870. Both the City and the defendant agreed to make good faith efforts to obtain MBE contractors to perform at least ten percent of the project. *Id.* On the day the defendant was required to provide the City with its MBE documentation, defendant called James Hough of Region Construction and asked whether Mr. Hough could find a MBE within a half hour. Interestingly, Mr. Hough's bathroom was being remodeled by the plaintiff, Lumen, a MBE owned business. Lumen agreed to a joint

venture project and Mr. Hough told defendant to add Lumen to its list of subcontractors; Lumen was the only MBE subcontractor. Mr. Hough prepared a bid for excavation work for the project and the bid was submitted in Lumen's name. *Id.* at 871.

After defendant received the bid, both defendant and Region attempted to prevent Lumen from performing the excavation work, which Region performed. Eventually, Lumen was allowed to perform some work on the project including constructing and maintaining temporary roads. Ultimately, however, defendant removed Lumen from the project because of its inability to pay its suppliers, which the trial court found to be directly attributable to defendant's ''heavy-handed''' control over the funds Lumen received. *Id.*

The Indiana Court of Appeals affirmed the trial court's finding of discrimination. *Id.* at 874. The court found that the evidence presented showed that defendant "attempted to prevent Lumen from participating in the project, …wrongfully exercised control over Lumen's finances, …intimidated [Lumen's employees] into leaving the job site, and…failed to assist Lumen as required by MBE regulations." *Id.* This evidence supported the conclusion that defendant intended to use Lumen as a front to obtain the contract and then wrongfully attempted to prevent Lumen from benefiting from the contract. *Id.*

ESG points to a number of instances that it believes show that, similar to the plaintiff in *Brant*, it was not given the opportunity to perform its role under the State contract. ESG contends that: (1) it was never provided information regarding the terms of lease documents ESG was having prepared for Schaller Anderson; (2) after signing the contract with the State, Advantage used Summit, a non-minority owned company , to locate and show potential locations for the Care Select program; (3) Advantage made misrepresentations to the State regarding the River Road lease limitations; (4) Schaller Anderson made misrepresentation that the State

requested updated letters of commitment; and (5) Defendants reduced ESG's role and failed to offer an explanation.  [Dkt. 115 at 22; Dkt. 118 at 16-17].

ESG ties all of these events together coupled with Advantage's delay in notifying the State that ESG would not be participating in the project and presents it as evidence of discrimination.  According to ESG, "[a] jury could believe that this was simply an attempt to ensure that Advantage still received the benefit of the MBE points that came along with the monies listed in the Contract as designated to ESG for its services." [Dkt. 115 at 19].    ESG contends that it was used as a "minority front" for Advantage and the delay in notifying the State allowed Advantage time to add four WBEs to the contract.  [Dkt. 115 at 19 (quoting *Muhammad v. Oliver*, 547 F.3d 874, 881 (7th Cir. 2008))].

Schaller Anderson contends that ESG's "minority front" theory fails as a matter of law. [Dkt. 125 at 3].   Schaller Anderson argues that the Seventh Circuit has rejected this as evidence of discrimination in Section 1981 claims by concluding that "[t]o provide favored treatment to black-owned businesses is to discriminate in favor of rather than against blacks, and while to cheat them of an opportunity for that favored treatment is disreputable behavior it does not disfavor them vis-à-vis whites; it removes rather than creates a racial preference." *Muhammed v. Oliver*, 547 F.3d 874, 881 (7th Cir. 2008).

The court goes on, however, stating that "[t]his would be a different case if the defendants would not have cheated similarly situated whites, for example, white women….There is no suggestion that the defendants want to make life difficult for blacks; they would have been happy to dupe a 'woman front' rather than a 'minority front'" *Id.*  While the "minority front" theory may fail when the defendant is indifferent as to race and would dupe any business that

qualifies as a MBE or WBE, the Court finds that when there is evidence that race might have played a role, the "minority theory" does not fail as a matter of law.

Here, ESG has provided evidence that would allow for an inference of racial discrimination. After deciding not to use ESG, Advantage added four WBEs and no MBEs to ensure it remained in compliance with the MBE/WBE program. [Dkt. 86 Ex. 7]. Without ESG's participation, only two of the seven remaining subcontractors were MBEs. [*Id.*] A reasonable trier-of-fact could believe that Advantage discriminated against ESG because of Mr. Nelson's race by using ESG to obtain MBE points and then, after being awarded the contract, denying ESG the opportunity to contract in favor of non-minority WBEs.

The undisputed fact that Advantage waited seven months to notify the State that ESG would not be participating in the project could be viewed as an attempt to allow time for Advantage to find WBEs to add to the project. Advantage employee Vicki Perry testified that "it never crossed [her] mind" to notify the State that ESG would not be participating in its original role in the project. [Dkt. 109 Ex. 3 Perry Dep. 142:7-12]. Before the final contract was approved, however, Advantage had made the decision that it did not make sense to lease from a subcontractor. [*Id.* 142:1-6]. At this stage of the litigation, this Court must make all reasonable inferences in favor of the nonmoving party and it is not unreasonable to infer that Advantage delayed notifying the State that ESG would not be participating in the project to allow itself time to find WBEs it could use instead of ESG.

Viewing the facts in the light most favorable to ESG indicates that Advantage and Schaller Anderson attempted to either drastically reduce ESG's role in the project or push ESG out of the project altogether. Defendants misrepresented to ESG the reason why ESG could not participate in the Nyhart lease. Schaller Anderson informed Mr. Nelson that ESG could not be

the sublease because ESG would not be occupying the space. [Dkt. 89 Ex. 15]. ESG has presented the Nyhart lease as evidence that there was no such occupancy requirement in the lease. [Dkt. 103 Ex. 13]. ESG was, in fact, acting as a broker of sorts and was looking for potential locations for Schaller Anderson, a role that, arguably, Summit took over. Schaller Anderson presented ESG with a new letter of commitment that reduced the annual amount from $500,000 to $112,750. Neither Defendant provided any explanation as to how they arrived at the $112,750 amount and it is unclear whether the State made a request for updated letters of commitment. When ESG resisted, Advantage and Schaller Anderson moved forward without ESG, but Advantage did not notify the State that ESG would not be participating in the project. Advantage only notified the State in response to a State audit; in which time, Advantage added four WBEs and no MBEs to the project in an effort to remain compliant. If believed, a trier-of-fact could infer that Advantage and Schaller Anderson intended to discriminate based on Nelson's race.

## ii. Whether the Discrimination Concerned the Making or Enforcing of a Contract

Under the third prong of the *Morris* standard, ESG must show that the discrimination concerned the making or enforcing of a contract. *Pourghoraishi*, 449 F.3d at 756. ESG claims this prong is not in dispute; however, Advantage disagrees and argues that ESG was not denied the opportunity to make or enforce a contract. [Dkt. 124 at 13]. Advantage cites to *Bagley v. Ameritech Corp*, 220 F.3d 518, 521 (7th Cir. 2000), where the court found that the plaintiff opted not to contract with defendant by walking out of defendant's store instead of buying the item from another worker. The court held that since defendant was not responsible for terminating the transaction, it did not violate § 1981. *Id.* at 522.

The Court finds *Bagley* distinguishable, however, because ESG did not have the option to contract with another party. ESG had to either accept the deal Advantage and Schaller Anderson proposed or risk being removed from the project. Both Advantage and Schaller Anderson contend that ESG was inflexible and refused to contract for anything less than its original role. Viewing the facts in a light most favorable to ESG, however, shows that Advantage and Schaller Anderson repeatedly attempted to alter ESG's role, and left ESG out of the process when it refused to accept a drastically reduced role. It is reasonable to infer from these facts that Defendants were attempting to push ESG out of the project, thus denying ESG the right to contract. Accordingly, the Court finds that ESG has presented evidence to establish a *prima facie* case of discrimination.[4]

### iii. Whether the Proffered Reasons were Pretext

Since ESG has presented sufficient evidence to establish a *prima facie* claim, a presumption of discrimination would arise. *Batteast Const. Co*, 194 F. Supp. 2d at 834. This would require Advantage and Schaller Anderson to rebut the presumption by presenting a legitimate non-discriminatory reason. *Id.* Advantage and Schaller Anderson contend that they did not contract with ESG to serve in its original role for the legitimate non-discriminatory reason that the decision to co-locate with Schaller Anderson dramatically changed the circumstances of the project's real estate needs and Advantage itself found the office space that

---

[4] Under the *McDonnell Douglas* standard, the Court finds that, at a minimum, there is a genuine dispute as to a material fact that would prevent summary judgment. Defendants argue that neither Summit nor Nyhart are similarly situated to ESG. [Dkt. 85 at 22; Dkt. 96 at 19]. To meets its burden of showing another person or entity is similarly situated, the plaintiff must show that the comparator is "directly comparable …in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002). Because the parties dispute the role that ESG was to have in the project, and the evidence is murky, summary judgment would be unlikely. Defendants also argue that ESG cannot show it met their legitimate expectations. [Dkt. 85 at 26; Dkt. 96 at 18]. There is evidence, however, that ESG performed a similar service for another client and ESG was, in fact, attempting to locate office space for the Care Select program. Schaller Anderson's argument that ESG was not serving a "commercially useful function" as required in the MBE/WBE rules is also disputed and contradicted by Advantage and ESG's representations to the State.

both companies would use. [Dkt. 85 at 28; Dkt. 96 at 19-20]. Additionally, Schaller Anderson contends it did not use ESG for its temporary space at the Nyhart building because Schaller Anderson had been informed that ESG could not sublease from Nyhart and then further sublease to Schaller Anderson. [Dkt. 96 at 19-20].

Since Defendants have articulated legitimate non-discriminatory reasons for not contracting with ESG, the burden shifts to ESG to show the reasons are a pretext for discrimination. *Batteast Const. Co., Inc.,* 194 F. Supp. 2d at 838. "'Pretext means more than an unusual act or a bad business decision; it is a lie or deceit used to cover one's tracks.'" *Id.* (quoting *Kulumani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 684-85 (7th Cir. 2000). If the Defendant honestly believes in the proffered reason for its actions, then pretext does not exist "even if the reasons are foolish or trivial or even baseless." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999).

ESG contends that pretext is shown by the same facts and evidence that it claimed showed intentional discrimination. [Dkt. 115 at 22; Dkt. 118 at 16-17]. According to ESG, "a reasonable jury could believe that Advantage's and Schaller Anderson's silence and misrepresentations were based in an effort to retain the benefit of the MBE points and, thus, maintain the Contract." [Dkt. 118 at 17].

ESG points out that the decision to co-locate effectively increased the square feet of office space that Advantage and Schaller Anderson would need. [Dkt. 115 at 21, Dkt. 118 at 16]. After the decision to co-locate, Ferguson told Nelson that Schaller Anderson would need approximately 18,000 square feet, Advantage would need approximately 18,000 square feet, and a third company would need approximately 10,000 square feet. [Dkt. 109 Ex. 7 at 38]. While Defendants were under no obligation to use ESG for all of its leasing needs, the decision to co-

locate does not explain a drastic reduction in ESG's role. From the evidence put forth, a reasonable trier-of-fact could conclude that Defendants' proffered reasons were not genuine.

In conclusion, ESG has met its *prima facie* burden and has presented evidence to show Defendants' reasons for not contracting with ESG were pretext. Accordingly, the Court denies both Advantage and Schaller Anderson's Motions for Summary Judgment on the discrimination claim. [Dkt. 84; Dkt. 87].

### C. Whether Advantage was a State Actor

ESG contends that Advantage was a state actor under 42 U.S.C. §1983. [Dkt. 115 at 22]. To be successful, ESG must show that Advantage acted under the color of state law. *Rodriguez v. Plymouth Ambulance Servs.*, 577 F.3d 816, 822 (7th Cir. 2009). A state will normally not be held liable for a private decision unless "'it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *Id.* at 823 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). "Thus, the State must somehow be responsible for the allegedly unlawful actions taken by the private party." *Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996).

ESG again cites *Brant Const. Co.* for support. In *Brant*, the Appeals Court found sufficient evidence for the trial court's finding that the plaintiff had a cause of action under Section 1983. 515 N.E.2d at 873-874. The finding was supported by the following evidence: (1) the waste water treatment expansion project was built on land owned by the City; (2) was funded by federal, state, and city monies, (3) the level of involvement of the City and the Board of Public Works and Safety in the project, and (4) the MBE requirements set out by the E.P.A. *Id.*

ESG alleges that "[t]he challenged action in this case is Advantage's removal of ESG from participation in the [Care Select program]." [Dkt. 115 at 24]. The thrust of ESG's

argument is that the State failed to independently verify Advantage's representations to the State including the reasons Advantage gave for not using ESG. Moreover, the State did not provide the formal written approval for ESG's removal but continued to show Advantage as compliant with the contract.

The Court finds ESG's argument unpersuasive to show that Advantage was a state actor. Unlike *Brant*, the project was not performed on State land and ESG has presented no evidence of the State's involvement in the project other than determining whether Advantage remained compliant with the program. Merely receiving State funding is not sufficient to establish state action. *Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982).

There is also no indication that the State encouraged Advantage's action or played any role in the challenged action. That the State relied on Advantage's representations does not establish state action. ESG cites *Gibson v. IBM Corp.*, for the proposition that Advantage was a state actor. No. 1:10-cv-00330-LJM-TAB, 2010 U.S. Dist. LEXIS 108072 (S.D. Ind. 2010). In *Gibson*, the court explained that when the state retains final decision-making authority, the private party is not acting under color of state law. *Id.* at *16. *Gibson* involved the determination of Medicaid eligibility where the private party made recommendations to the State. *Id.* Evidence suggested that the State merely rubber stamped those recommendations. The court found that the State, while retaining final responsibility, wholly relied upon the private party to provide information upon which the ultimate determination would be based. *Id.*

ESG argues that the State, while retaining final responsibility over whether Advantage could remove ESG, wholly relied on Advantage's representation in making its determination and therefore, Advantage should be deemed a state actor. This Court, however, does not believe *Gibson* stands for the proposition that the State has to independently verify all representations

made to it by private parties to a contract. This would overwhelm the State. Nor should the State be required to assume that representations made to it are false. The State did retain responsibility over whether Advantage remained compliant with the MBE/WBE program and it was reasonable to rely upon Advantage's representations to the State in making that determination. Therefore, the Court finds that Advantage was not a state actor when it decided not to use ESG in the project and denies ESG's Motion for Partial Summary Judgment on this point.

## D. Whether Schaller Anderson Engaged in Tortious Interference

Schaller Anderson contends that it is entitled to summary judgment for ESG's claims for tortious interference with a contract and with a business relationship. [Dkt. 96 at 21]. To state a claim for tortious interference with a contract, ESG must establish: (1) the existence of a valid and enforceable contract; (2) Schaller Anderson's knowledge of the existence of the contract; (3) Schaller Anderson's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from Schaller Anderson's wrongful inducement of the breach. *Gov't Payment Serv. v. Ace Bail Bonds*, 854 N.E.2d 1205, 1209 (Ind. Ct. App. 2006).

For the tortious interference with a business relationship claim, ESG must establish: (1) the existence of a valid business relationship; (2) Schaller Anderson's knowledge of the existence of the relationship; (3) Schaller Anderson's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from Schaller Anderson's wrongful interference with the relationship. *Id.* The tortious interference with a business relationship claim requires some independent illegal action. *Meridian Sec. Ins. Co. v. Hoffman Adjustment Co.*, 933 N.E.2d 7, 13 n.4 (Ind. Ct. App. 2010).

ESG contends that Schaller Anderson tortiously interfered[5] by approaching "ESG with unauthorized representations from the State in an attempt to significantly reduce ESG's compensation and change its role pursuant to the Contract." [Dkt. 22 at 22]. With regard to ESG's tortious interference with a business relationship claims, the Court finds that a party cannot tortiously interfere with its own business relationship. *Meridian Sec. Ins. Co.*, 933 N.E.2d at 13. ESG was to provide real estate services for Schaller Anderson and thus Schaller Anderson cannot tortiously interfere with its own business relationship. To the extent that ESG is basing this claim on its business relationship with Advantage and the State, the Court finds that Schaller Anderson, as a subcontractor, was also a party to that business relationship. ESG's tortious interference with a contract claim fails for a similar reason. This Court has already determined that ESG was not a third-party beneficiary to the contract between Advantage and the State and thus cannot point to a valid and enforceable contract in which it had rights.

## IV. CONCLUSION

For the above stated reasons, the Court **DENIES** ESG's Motion for Partial Summary Judgment in its entirety. [Dkt. 105]. The Court **GRANTS** Advantage's Motion for Summary Judgment in regards to the third-party breach of contract claim and **DENIES** the Motion in regards to ESG's discrimination claim. [Dkt. 84]. The Court **GRANTS** Schaller Anderson's Motion for Summary Judgment in regards to the tortious inference claims and **DENIES** the Motion in regards to ESG's discrimination claim. [Dkt. 87].

SO ORDERED.

Date: 06/06/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

---

[5] ESG does not differentiate in its analysis between the tortious inference with a contract claim and its tortious inference with a business relationship claim. The analysis appears to focus on its tortious interference with a contract claim based on ESG's alleged status as a third-party beneficiary.

DISTRIBUTION:

Nicholas C. Huang
NICHOLAS C. HUANG, PC
nhuang@gmail.com

Ryan Kenneth Gardner
rgardnerlaw@gmail.com

Kevin M. Kimmerling
BAKER & DANIELS
kevin.kimmerling@bakerd.com

Ryan Michael Hurley
BAKER & DANIELS
ryan.hurley@bakerd.com

Anne L. Cowgur
BINGHAM McHALE LLP
acowgur@binghammchale.com

David O. Tittle
BINGHAM McHALE LLP
dtittle@binghammchale.com

Shannon D. Landreth
BINGHAM McHALE LLP
slandreth@binghammchale.com